NO. 12-10864-A

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

───────────────

## UNITED STATES OF AMERICA,
*Plaintiff/appellee,*

v.

## LEIGHTON MARTIN CURTIS,
*Defendant/appellant.*

───────────────

## On Appeal from the United States District Court
## for the Southern District of Florida

───────────────

## BRIEF OF THE APPELLANT
## LEIGHTON MARTIN CURTIS

───────────────

MICHAEL CARUSO
Interim Federal Public Defender
Gail M. Stage
Assistant Federal Public Defender
Attorney for Appellant
1 E. Broward Blvd., Suite 1100
Fort Lauderdale, Florida 33301
Telephone No. (954) 356-7436

## THIS CASE IS ENTITLED TO PREFERENCE
## (CRIMINAL APPEAL)

KMW99.1

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### United States v. Leighton Martin Curtis
### Case No. 12-10864-A

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Caruso, Michael, Interim Federal Public Defender

Curtis, Leighton Martin, Defendant/Appellant

Dispoto, Mark, Assistant United States Attorney

Ferrer, Wifredo, United States Attorney

Garber, Honorable Barry L., United States Magistrate Judge

Gershman, Robert S., Esquire

Lenard, Honorable Joan A., United States District Judge

Marks, Neison, M., Assistant Federal Public Defender

O'Sullivan, Honorable John J., United States Magistrate Judge

Salyer, Kathleen M., Assistant United States Attorney

Schultz, Anne R., Assistant United States Attorney, Chief of Appellate Division

Seltzer, Honorable Barry S., United States Magistrate Judge

Snow, Honorable Lurana S., United States Magistrate Judge

C-1 of 1

Stage, Gail M., Assistant Federal Public Defender

Steinberg, Corey, Assistant United States Attorney

United States of America, Plaintiff/Appellee

White, Hon. Patrick A., United States Magistrate Judge

Williams, Honorable Kathleen M., Former Federal Public Defender

## STATEMENT REGARDING ORAL ARGUMENT

The defendant respectfully submits that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision making process.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . . . . . . C-1

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Statement of Facts, Course of Proceedings and Disposition

        in the District Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Standards of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

ARGUMENT AND CITATIONS OF AUTHORITY. . . . . . . . . . . . . . . . . . . . 39

Issue I

THE DISTRICT COURT SHOULD HAVE SUPPRESSED THE
VIDEO RECORDING WHICH WAS RECORDED IN VIOLATION
OF MR. CURTIS' EXPECTATION OF PRIVACY. . . . . . . . . . . . . . . . . . 39

Issue II

THE EVIDENCE WAS INSUFFICIENT TO SUPPORT MR. CURTIS'
CONVICTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Issue III

THE DISTRICT COURT ERRED WHEN IT RULED MR. CURTIS

COULD NOT INTRODUCE EVIDENCE UNDER FED.R.EVID. 412

DENYING MR. CURTIS A FAIR TRIAL. . . . . . . . . . . . . . . . . . . . . . . . 45

Issue IV

MR. CURTIS' 360-MONTH SENTENCE WAS BOTH

PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE. . . . . 48

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

# TABLE OF CITATIONS

**CASES:**

*United States v. Booker*,

    543 U.S. 220 (125 S.Ct. 738 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Campbell*,

    491 F.3d 1306, 1314 (11th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

*United States v. Garrett*,

    190 F.3d 1220 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Giordano*,

    416 U.S. 505, 94 S.Ct. 1820 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Hill*,

    643 F.3d 807 (11th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Hunt*,

    459 F.3d 1180 (11th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Lopez-Ramirez*,

    68 F.3d 438 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 42

*United States v. McCarrick*,

    294 F.3d 1286 (11th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 42

iv

*United States v. McKinnon*,

    985 F.2d 525 (11th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Mieres-Borges*,

    919 F.2d 652 (11th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

*United States v. Scott*,

    441 F.3d 1322 (11th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Talley*,

    431 F.3d 784 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 48

*United States v. Tokars*,

    95 F.3d 1520 (11th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Williams*,

    435 F.3d 1350 (11th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**STATUTORY AND OTHER AUTHORITY:**

18 U.S.C. § 1591(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

18 U.S.C. § 1591(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 2510(11). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

18 U.S.C. 2511. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

18 U.S.C. § 2515. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 39

18 U.S.C. § 2251(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 42

18 U.S.C. § 2518(10)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-40

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 50

18 U.S.C. § 3742. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U.S.S.G. § 2G2.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

U.S.S.G. § 2G2.1(b)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

U.S.S.G. § 2G2.1(b)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

U.S.S.G. § 2G2.1(b)(6)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

U.S.S.G. § 2G2.1(b)(6)(B)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 49

U.S.S.G. § 3C.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Fed.R.Crim.Proc. 29. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Fed.R.Evid. 401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Fed.R.Evid. 412. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11-12, 37, 45, 47

## STATEMENT OF JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the defendant was charged with an offense against the laws of the United States.  The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States.  The appeal was timely filed on February 14, 2012, from the final judgment and commitment order entered on February 13, 2012, that disposes of all claims between the parties to this cause.

## STATEMENT OF THE ISSUES

### Issue I

**WHETHER THE DISTRICT COURT SHOULD HAVE SUPPRESSED THE VIDEO RECORDING WHICH WAS RECORDED IN VIOLATION OF MR. CURTIS' EXPECTATION OF PRIVACY?**

### Issue II

**WHETHER THE EVIDENCE WAS INSUFFICIENT TO SUPPORT MR. CURTIS' CONVICTIONS?**

### Issue III

**WHETHER THE DISTRICT COURT ERRED WHEN IT RULED MR. CURTIS COULD NOT INTRODUCE EVIDENCE UNDER FED.R.EVID. 412 DENYING MR. CURTIS A FAIR TRIAL?**

### Issue IV

**WHETHER MR. CURTIS' 360-MONTH SENTENCE WAS BOTH PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE.?**

## STATEMENT OF THE CASE

Leighton Curtis, the appellant, was the defendant in the district court and will be referred to by name or as the defendant.  The appellee, United States of America, will be referred to as the government.  The record will be noted by reference to the document number and page number of the Record on Appeal as prescribed by the rules of this Court.[1]

Mr. Curtis is incarcerated.

### Statement of Facts, Course of Proceedings and Disposition in the District Court

This case came to law enforcement's attention when a young woman wrongly accused Leighton Curtis of kidnaping another young woman.  Ultimately those charges were found to be completely false, but these charges were the end result.

In mid-January, 2011, Mr. Curtis was called to the El Palacio hotel, in Broward County Florida, by a young woman, who was minor and shall be called LS.  LS asked Mr. Curtis to pick her up.  He did.  Another young woman, who was with LS and who was also a minor, KP, called police and claimed LS had been kidnaped by Mr. Curtis.

Investigating officers questioned Mr. Curtis, who denied the kidnaping.  Later, LS contacted police and confirmed she was okay and went willingly with Mr. Curtis.

---

[1] The Clerk of the Court has not yet certified the record on appeal and, therefore, no volume numbers have been assigned at the time this brief is being filed.

3

After these events, Mr. Curtis took LS home to her family in North Carolina. He returned to South Florida and was arrested.

### 1.    The Charges

On March 31, 2011, a grand jury in the Southern District of Florida indicted Mr. Curtis on one count of child sex trafficking, involving KP, in violation of 18 U.S.C. § 1591(a)(1).  (DE 13).   On May 5, 2011, the government filed a superceding indictment which added an additional count accusing Mr. Curtis of engaging in child sex trafficking, involving LS, also in violation of 18 U.S.C. § 1591(a)(1).  (DE 26). Finally, a third superceding indictment was filed, containing a third count which alleged that Mr. Curtis induced LS to engage in sexually explicit conduct to produce child pornography using materials which had been shipped in interstate commerce, in violation of 18 U.S.C. § 2251(a).  (DE 39).   Just before trial, the government dismissed Count 1, relating to KP, and the case only went forward on Counts 2 and 3 which involved LS.  (DE 86).

Mr. Curtis pled not guilty.  (DE 47).

### 2.    The Motion to Suppress

The government expressed its intention to offer into evidence at trial a video recording made by LS in a hotel room.  In the beginning of the video, which was recorded in June or July, 2010, by LS using a web camera on her computer, Mr.

4

Curtis is engaged in a telephone conversation, on his cell phone, with an unknown female. (DE 72:66). The video goes on to show conversations between LS and Mr. Curtis. During the video, LS answers several different phone calls on her cell phone from unknown men. Mr. Curtis is naked from the waist down. The recording was made without Mr. Curtis' knowledge.

Mr. Curtis filed a motion to suppress the recording, under 18 U.S.C. § 2515, arguing that it was made in violation of his statutory rights, in that he did not agree to be recorded and was unaware he was being recorded and in violation of his Constitutional right to privacy. (DE 51). The government opposed the motion, arguing that LS did not intentionally make the recording, that Mr. Curtis made no attempt to keep his conversation private and consented to LS's monitoring and recording of the conversation. (DE 57).

An evidentiary hearing was conducted on August 22, 2011. At the start of the hearing, the government conceded that LS intentionally turned on her computer web camera and began recording she and Mr. Curtis, but then forgot the computer was recording and allowed the web camera to record for about an hour and a half. (DE 72:4-5). She discovered the recording the following day. (DE 72:4). She intentionally turned the computer screen toward Mr. Curtis so that it recorded both she and Mr. Curtis. (DE 72:4-5). The government also conceded that the

5

communication LS recorded, a telephone conversation between Mr. Curtis and an unidentified female, was an "oral communication" and would only be admissible if Mr. Curtis had an expectation of privacy.  (DE 72:5).

The magistrate judge inquired of Mr. Curtis, as to why the portion of the recording, after Mr. Curtis concluded his phone call with the unidentified female, was contrary to the law since federal law permits the recording of a conversation as long as one of the participants consents.  (DE 72:10).  Mr. Curtis argued that he still had an expectation of privacy in his conversation, but he admitted that his argument was "very weak."  (DE 72:11).

The government argued that Mr. Curtis had no expectation of privacy in his conversation with the unknown female on the phone because he used his cell's speaker phone function, he spoke loudly, made no move to conceal his conversation from LS and even asked her opinion about the conversation when it concluded.  (DE 72:16-18).  The government argued that if Mr. Curtis knew LS was listening to the conversation, she had the right to record it.  (DE 72:19).

Mr. Curtis testified.  (DE 72:20).  He testified he did not know he was being recorded.  (DE 72:21).  He stated that he would have covered the lower part of his body if he knew he was being recorded.  (DE 72:23).  He testified that he used the speaker phone function of his cell phone when he was speaking to the unidentified

6

female because the phone could only be answered using that function–it was stuck on speaker phone and could not be deactivated.  (DE 72:22-23, 27).  He said he never intended for LS to be a party to the conversation.  (DE 72:24).  On cross examination, however, Mr. Curtis admitted that he did not take any affirmative steps to keep LS from being able to hear the conversation.  (DE 28-30).

Mr. Curtis objected to the government's use of a transcript of the video, arguing that he had not had time to authenticate the transcript.  (DE 72:30-31).  The magistrate judge ruled that the government could use the transcript during cross examination.  (DE 72:31).  Mr. Curtis denied he was attempting to recruit the woman to be a prostitute for him.  (DE 72:31).  He stated he did not know what the term "trick" meant as it relates to prostitutes.  (DE 72:36).  He did not recall asking LS, after the phone call concluded, whether he repeated himself too often during the conversation.   (DE 72:38).   He acknowledged that LS had several phone conversations with men, but denied that he knew LS was receiving calls from customers seeking her prostitution services.  (DE 72:39).

The government called LS to testify.  (DE 72:41).  She identified a DVD with a recording of the video she made when she was staying at the Sea Club hotel with Mr. Curtis.  (DE 72:42-43).  Mr. Curtis again objected to the use of the transcript of the video.  (DE 72:43).  LS testified that she watched the video and followed along

7

with the transcript and did not believe it contained inaccuracies.  (DE 72:44).  The
district court admitted the transcript into evidence, but gave Mr. Curtis 48 hours to
correct any inaccuracies.  (DE 72:45).

LS testified that she was playing around with the web camera on the computer
because she and Mr. Curtis just bought the computer.  (DE 72:46).  She admitted that
she lied to law enforcement when she first told them about the recording and claimed
she unintentionally turned on the web camera.  (DE 72:69).  She stated Mr. Curtis
knew she liked to record things and take pictures.  (DE 72:46).  He never told her she
could not record him or take pictures.  (DE 72:46-47).

LS testified that Mr. Curtis was trying to recruit the unidentified female into
the prostitution business.  (DE 72:49).  She stated that she was a prostitute and Mr.
Curtis was her pimp.  (DE 72:49).  She testified that it was not unusual for Mr. Curtis
to use the speaker phone function of his cell phone when he took phone calls.  (DE
72:50).  She also used the speaker phone function because they "had no secrets."  (DE
72:50).  She said his phone was not broken at the time the recording was made and
he could deactivate the speaker phone function.  (DE 72:50).

LS testified that she was close to Mr. Curtis when he took the phone call from
the female and that she could clearly hear the conversation.  (DE 72:52).  She stated
that Mr. Curtis never asked her to leave the room and he knew she was present.  (DE

8

72:52).  After the conversation ended, LS testified that Mr. Curtis asked her how he did.  (DE 72:57-58).

LS testified that she took several calls from men and put the calls on her cell phone's speaker function.  (DE 72:59).  She stated that Mr. Curtis could hear both sides of her conversation.  (DE 72:60).  At times Mr. Curtis told her what to say because "[s]ometimes I choke up when I speak to clients."  (DE 72:60).

LS testified that she eventually closed her computer ending the recording.  (DE 72:61).  She stated that she "believes" she and Mr. Curtis watched the video together after she discovered it the following day.  (DE 72:61).

At the conclusion of LS's testimony, Mr. Curtis argued that LS's mere presence in the room did not vitiate his right to engage in a private conversation with the expectation it would not be recorded.  (DE 72:80-81).  The government argued that none of Mr. Curtis' actions indicated he had an expectation of privacy in the telephone conversation with the unidentified female.  (DE 72:81).  The government further argued that, even if Mr. Curtis did not consent to his conversations being recorded, the recording should not be suppressed if LS was present and could easily hear the conversation.  (DE 72:83-84).

The magistrate judge issued a Report and Recommendation ("R&R") recommending that the district court deny Mr. Curtis' motion to suppress.  (DE 70).

9

The magistrate judge found that Mr. Curtis' testimony was not credible. (DE 70:3, n.2). He found that Mr. Curtis was LS's pimp and that he was trying to recruit the unidentified female to work for him as a prostitute. (DE 70:3-4). The magistrate judge found that Mr. Curtis had no expectation of privacy in his communications with the unidentified female. (DE 70:6). It found that Mr. Curtis made the communications while LS was in the room and that he discussed the conversation with LS. (DE 70:6). The magistrate judge found that Mr. Curtis also had no expectation of privacy in the recorded conversations between himself and LS and LS and the unidentified men who called her. (DE 70:7).

Mr. Curtis filed objections to the magistrate judge's findings of facts and its conclusion that Mr. Curtis had no expectation of privacy. (DE 71). The district court adopted the magistrate judge's factual findings and conclusions of law and entered an order denying Mr. Curtis' motion to suppress. (DE 77).

### 3.    The Trial

On November 9, 2011, the day before trial started, the government filed a Motion in Limine seeking to prevent Mr. Curtis from introducing evidence relating to LS's consent or her prior sexual history. (DE 82). Specifically the motion sought to exclude any evidence or argument regarding LS's consent to prostitute herself or to produce sexually explicit images of herself. (DE 82:2). The government argued

that the evidence was not relevant and that, even if it was relevant, it was barred by

Fed.R.Evid. 412.  Rule 412 bars admission of evidence concerning a victim's sexual

history or past behavior.  Fed.R.Evid. 412.  The government asserted that none of the

exceptions to the rule applied in this case.  (DE 82:5-8).  Finally, the government

argued that even if evidence of LS's consent and past sexual history was relevant and

admissible under Rule 412, its probative value was outweighed by the danger of

unfair prejudice.  (DE 82:8-9).  The government also alleged that Mr. Curtis had

failed to comply with the procedural requirements of Rule 412 because he failed to

file a motion to admit the evidence 14 days prior to trial and had failed to describe the

evidence and state the purpose for which it would be offered.  (DE 82:8).

Mr. Curtis opposed the government's motion.  (DE 92).  He argued that the

government's attempt to bar the evidence would deny Mr. Curtis a fair trial under the

Fifth and Sixth amendments to the U.S. Constitution.  (DE 92:1).  Mr. Curtis argued

that the evidence he wished to offer went to the "very heart of his defense."  (DE

92:3).  Mr. Curtis argued that some of the evidence he wished to offer did not fall

under the definition of "other sexual behavior" or "sexual disposition" because it

merely involved the posting of pictures or writing of ads.  (DE 92:11).  He further

argued that pictures and videotapes of the victim engaging in sexually explicit

conduct can come in for a purpose other than the issue of "consent," such as attacking

11

a witness' credibility or rebutting an element of an offense. (DE 92:11). Mr. Curtis argued that he did not want to introduce the evidence to prove LS's bad character. (DE 92:14).

In the interest of caution, on the second day of trial, Mr. Curtis filed a Notice of Intent to Introduce Fed.R.Evid. 412 evidence. (DE 97). He argued that he wanted to introduce still photographs and video recordings of sex acts performed by LS in which Mr. Curtis was not involved to show that he was not her pimp. (DE 97:2). He argued that LS took the pictures and made the videos without anyone's knowledge. (DE 97:2). He argued that LS engaged in prostitution before he met her and after he was arrested.

Trial started on November 10, 2011, with jury selection. (DE 149). The following day, prior to the start of the government's case, Mr. Curtis informed the district court that he intended to introduce still photographs and videos of LS having sex with men other than Mr. Curtis. (DE 150:15). The government argued that it intended to illicit testimony from LS about her prostitution activities before and after she met Mr. Curtis and that the videos and still photographs were irrelevant. (DE 150:17). Mr. Curtis responded that the evidence would rebut the elements of the sex trafficking charge alleged in Count 2 of the indictment. (DE 150:18). The district court reserved ruling on the request. (DE 150:20).

12

At the end of the second day of trial, Mr. Curtis again argued that he should be permitted to introduce the still photographs and videos of LS because it would show that Mr. Curtis was not forcing her to prostitute herself. (DE 150:174-75). The district court found that LS testified she engaged in prostitution before she met the defendant and that the government proffered she would also testify that she engaged in prostitution after Mr. Curtis was arrested and, therefore, the still photographs and videos had no probative value and were irrelevant. (DE 150:181-82).

After LS's testimony, Mr. Curtis again argued he should be permitted to question LS about the making of the videos after Mr. Curtis was arrested. (DE 151:71). The district court ruled that he was not permitted to question LS about the videos. (DE 151:71).

### A.    LS

LS was the first witness called by the government. (DE 150:47). She testified that she was born February 20, 1994, and identified her birth certificate which was admitted into evidence. (DE 150:47-48). LS testified that she started running away from her home in North Carolina when she was 12 years old. (DE 150:48-49). Her parents were divorced and she was sent to live with her father in Tennessee when she was 14 years old. (DE 150:49). She also ran away from him and from juvenile facilities, including a rehabilitation facility, where she was placed after her father

13

gave up his parental rights. (DE 150:50-51). In the fall of 2009, she returned to North Carolina and met a man named King, who was a pimp and for whom she worked. (DE 150:52-53). She left King after two weeks and moved in with a male friend in Raleigh, North Carolina. (DE 150:53). He taught her how to post prostitution ads on craigslist and backpage, social networking sites, just as King had done while she worked for him. (DE 150:53-54). She lied to friends and told them she was going to New Jersey to throw off the people looking for her. (DE 151:95).

LS testified that on Christmas Eve, 2009, she met Mr. Curtis after he responded to an ad she posted on backpage. (DE 150:54-55). LS said she took mushrooms the night she met Mr. Curtis. (DE 151:123). She only remembers parts of their first conversation. (DE 151:123). She testified, however, she remembered he told her he liked her ad and asked her to join his "family" and to travel with him and work with him. (DE 150:55). Although they agreed to meet, she did not show up, and he continued to call her numerous times. (DE 150:56). LS stated that, on December 28, 2009, she decided to meet Mr. Curtis. (DE 150:57). She testified that she told him she was 15 years old and that she was a runaway, even showing him a flyer and a video posted on the internet by her family. (DE 150:58,89,131). He picked her up the following day. (DE 150:58). He told her "the rules," which included her giving him money after she had sex with a client. (DE 150:59). They drove to Florida. (DE

14

150:60).

On the way to Florida, LS and Mr. Curtis stopped in Greenville, South Carolina where he took naked pictures of her holding a teddy bear. (DE 150:61). She testified that she was never forced to pose naked and she sometimes even took naked pictures of herself. (DE 150:120). They next stopped in Orlando, Florida, where she went on several prostitution dates after Mr. Curtis posted ads on social networking sites. (DE 150:62). LS testified that she and Mr. Curtis left Orlando and traveled to Fort Lauderdale, Florida. (DE 150:66).

LS testified that at first Mr. Curtis posted the ads and he always paid for them with a Visa credit card or a gift card. (DE 150:63). To post an ad, a person must enter a username, password, address, credit card number and expiration date. (DE 150:64,83-84). Eventually, she posted her own ads after Mr. Curtis taught her what to say. She used his credit card number which she memorized and always with Mr. Curtis' permission, except when she ran away from him once. (DE 150:67,79-80; DE 151:32). LS identified several of the ads which were posted. (DE 150:70). One ad showed a contact email address as "sharpstepper@aol.com" and identified the name on the Visa credit card as Donna Marie Williams, Mr. Curtis's mother, and her home address. (DE 150:71,72). She identified another ad which contained Mr. Curtis's father's address in Charlotte, North Carolina. (DE 150:73). She identified another

ad which contained the email address, leebus18@yahoo.com, which she stated was another of Mr. Curtis' email addresses. (DE 150:115). The ads contained her phone number so that the clients could contact her. (DE 150:72). She stated that she could not use some pictures of herself in the ads because she looked too young or she was naked. (DE 150:82,125).

When a client called her, LS testified that she would get the client's name, occupation and determine whether they were with law enforcement. (DE 150:85).

LS testified that Mr. Curtis also paid for the hotel rooms. (DE 150:65,96). He would usually only get one room which they would share. (DE 150:66). She estimated that they stayed in 50 different hotels during the year and a half she was with Mr. Curtis. (DE 150:74).

She stated that she worked five days a week and usually saw between five to seven "dates" a day. (DE 150:66). LS testified that she would sometimes get a week or two off from working, but had to go back to work when she and Mr. Curtis needed money. (DE 150:76). She stated that she gave the money from the dates to Mr. Curtis. (DE 150:62,66,78). Sometimes he would lose it all at a casino where he gambled often. (DE 150:76,102). She testified that he never had a regular job while they were together. (DE 150:76). Sometimes he gave her money for manicures and shopping. (DE 150:78). He used the money to pay for his Cadillac Escalade, car

insurance, food and other necessities. (DE 150:78). She testified that she worked on her 16th birthday. (DE 150:73). LS testified that she and Mr. Curtis had sex on a regular basis. (DE 150:65).

LS testified that Mr. Curtis told her how much to charge each client, depending on whether the date was an "in-call"–in the hotel room where she was staying– or an "out-call"–she would go to the client. (DE 150:67). She stated Mr. Curtis would leave the hotel room when she had an in-call. (DE 150:86). She always got her money up front and counted it because that is what Mr. Curtis taught her to do. (DE 150:87). LS testified that she preferred out-calls because she did not always have to have sex with a client, unlike in-calls. (DE 150:88). She testified that Mr. Curtis set the pricing. (DE 151:9). One hundred dollars was the minimum price for fifteen minutes, a half hour cost $150 and an hour cost $200. (DE 151:9). Sometimes clients would be charged more depending on how much money they had. (DE 151:9). She received tips and sometimes kept them. (DE 151:9).

LS testified that Mr. Curtis gave her a fake I.D. card so that she could order alcohol when they went out. (DE 150:74,156; DE 151:28). She stated that Mr. Curtis took the I.D. from a woman who left her purse in his car and that the woman and LS looked similar. (DE 150:157). The woman's I.D. made her look over 21 years old. (DE 150:157). She once used the I.D. to check into a hotel room. (DE 150:158).

17

LS testified that during the year and half she and Mr. Curtis were together, he had five or six other girls working with them. (DE 150:94,96). He found the girls on backpage and would speak to them on speaker phone so that she could also listen. (DE 150:95). She posted ads for the girls and they also went on "dates." (DE 150:96). During the time she was with Mr. Curtis, they traveled to Georgia, North Carolina, Miami, Fort Lauderdale, Orlando and Tampa. (DE 150:99).

LS testified that on Easter, 2010, someone stole Mr. Curtis's truck, their clothes, money and computer. (DE 150:106-07). She stated that everything was stolen by the pimp of a girl Mr. Curtis was trying to recruit into the "family." (DE 150:107). LS testified that she and Mr. Curtis moved in with his mother and used her computer to post ads, but she continued to work at various hotels. (DE 150:108-09). She lied to Mr. Curtis' mother about her age several different times because she couldn't keep her stories straight. (DE 150:108,126). LS admitted that Williams took her in and treated her as a member of the family. (DE 151:109). She was invited to spend the holidays with the family and to attend family events. (DE 151:109). Eventually, she and Mr. Curtis bought a new computer with money she earned. (DE 150:109). Mr. Curtis replaced the truck with a small car, but later sold it and purchased a new Cadillac Escalade truck. (DE 150:109). LS identified a purple Kodak camera that she and Mr. Curtis used to take pictures of her to place in some

18

of the ads they posted.  (DE 150:111).

LS testified that she loved Mr. Curtis and that he told her he loved her and they would be together.  (DE 150:88-89,160).  She stated they talked about a future together and getting a regular job.  (DE 150:89).  She even tattooed his name on her chest in Chinese letters.  (DE 150:162).  LS admitted, however, that she also had a crown tattoo.  (DE 151:115).  She identified pictures of herself with Mr. Curtis' mother and other family members and friends.  (DE 150:160).  LS testified that she ran away from Mr. Curtis a few times after they fought.  (DE 150:161).  He would ask her to come back.  (DE 150:161).

The government then showed the videotape recorded by LS and which was the subject of the motion to dismiss.  (DE 150:130).  Mr. Curtis renewed his objection to the videotape's admission into evidence.  (DE 150:130).  LS confirmed that she made the video recording when she and Mr. Curtis were staying at the Sea Club hotel in South Florida.  (DE 150:132).  She testified that Mr. Curtis was speaking with a girl on his cell speaker phone about joining the "family" and working for him.  (DE 150:138).  She testified that she answered several calls from clients on her speaker phone which is what she did most of the time.  (DE 150:141).  She testified that one customer wanted an out-call and another wanted an in-call.  (DE 150:142).  She told the out-call customer that it would cost $200 for her to meet him.  (DE 150:144).  She

19

wanted to go on the out-call because she didn't have to have sex with the client and the date would be quicker. (DE 150:145). She ultimately took the in-call date and may have also taken the out-call. (DE 150:145-46).

LS identified her cell phone which was admitted into evidence. (DE 150:147). She also identified a cell phone she claimed belonged to Mr. Curtis with a cell number, 704-492-0698. (DE 150:148,149). LS testified that she and Mr. Curtis texted with each other. (DE 150:163). She identified a government's exhibit claiming it represented text messages between she and Mr. Curtis. (DE 150:164). She identified some of the texts as coming from the same phone number she stated belonged to Mr. Curtis while she knew him. (DE 150:168). After her memory was refreshed, she identified a phone number receiving the texts as belonging to her, although she further testified that she had several different phone numbers while she was with Mr. Curtis. (DE 150:169). LS was unable to remember any other phone numbers she claimed to have had. (DE 151:97).

LS went through some of the texts in which she discussed wanting to post ads for herself and be independent. (DE 150:171). She wanted to work on her own and not have a "daddy" as she called Mr. Curtis. (DE 151:7). She identified a text in which she is stating that a Hispanic male, 49 years old, wants to spend a half hour with her for $150. (DE 151:8). LS identified a text in which she stated that she met

20

a man at the casino, who paid her $250 and she did not have to have sex with him. (DE 151:11). In another text, LS states that "pimping ain't easy." (DE 151:10,11). She stated that she meant it was not easy for Mr. Curtis because he had another girl at the time, KP, and he was having a hard time with her. (DE 151:10).

Mr. Curtis had picked up the girl, KP, without discussing it with LS. (DE 151:12). LS testified that Mr. Curtis told her KP was 17 years old. (DE 151:14). She and KP sometimes went out on dates together because they could make more money. (DE 151:15). She identified several pictures of she and KP in Mr. Curtis' truck. (DE 151:18). She stated she became uncomfortable with KP because she woke up in the night and saw KP and Mr. Curtis having sex. (DE 151:19).

At some point, KP and LS decided they would run away from Mr. Curtis because LS wanted to be independent. (DE 151:20). Mr. Curtis called and texted her to come back. (DE 151:24). She testified that he texted her and told her he was cleaning out the hotel room and then said, "Go ahead, 16-year-old." (DE 151:24). The next text stated, "I like that. You of all people. Our time meant nothing. If I ever find you, I'm a show you how my pimp hand strong. Don't end up dead." (DE 151:24). She understood the text to mean that their time together meant nothing and if he found her he would hurt her. (DE 151:25). Eventually, she called Mr. Curtis and asked him to pick her up because she loved him and like being around him. (DE

21

151:38).

When she made the call, LS was staying at the El Palacio Hotel in Broward County. (DE 151:39). She did not tell KP she called Mr. Curtis. (DE 151:38,40,106). LS testified that when Mr. Curtis picked her up with her belongings, they stayed with his friends. (DE 151:42). KP called the police and claimed LS had been kidnaped, but LS testified she went willingly with Mr. Curtis. (DE 151:105). The police came to Mr. Curtis' friends' house and towed Mr. Curtis' truck. (DE 151:45). Mr. Curtis left the following morning and went to the police station to give a statement. (DE 151:45). Mr. Curtis asked LS to call the police and tell them that she was okay. (DE 151:107). LS stated that she made the call and left a message. (DE 151:107). Later in the day, Mr. Curtis' mother picked up LS and LS told her how old she was. (DE 151:46). Mr. Curtis returned to his mother's home and told LS that the police took the Kodak camera and their cell phones, but not the computer and other belongings. (DE 151:47).

The following day LS and Mr. Curtis left South Florida and drove to her mother's home. (DE 151:49). LS testified that she wanted Mr. Curtis to meet her family because she loved him and wanted to be with him. (DE 151:85). They stayed with her mother. (DE 151:84). Her mother and Mr. Curtis took her to the rehabilitation facility in Tennessee where she had to remain for two weeks. (DE

22

151:50). While she was in the facility, she had frequent contact with Mr. Curtis who, LS testified, was staying with her cousin, Dina Walker, in North Carolina. (DE 151:51,87). She put him on her phone list, but listed him as Carl Walker because he was using a phone at Walker's home. (DE 151:88). Although, LS testified that she wasn't allowed to have long phone conversations, she admitted that at least one conversation with Mr. Curtis lasted for forty minutes. (DE 151:89).

She was still in love with Mr. Curtis. (DE 151:52). She kept a journal while she was in the facility which was introduced into evidence. (DE 151:52-53). She believed that she and Mr. Curtis would get married, get a job and go to school when she was released from the facility. (DE 151:52,56). LS testified that she was worried about making money if she got a regular job because she liked having money. (DE 151:57).

LS testified that she saw Mr. Curtis as soon as she was released from the rehabilitation facility. (DE 151:58). She stated that they did not have any money and so she started posting prostitution ads again instead of getting a regular job. (DE 151:58). She said that she would leave her mother's home and Mr. Curtis would take her to a hotel where she would meet clients. (DE 151:59). LS testified that eventually, Mr. Curtis got another girl to work for him because LS was keeping the money she made. (DE 151:60). Mr. Curtis then left North Carolina to make another

23

statement to law enforcement in South Florida, where he was arrested.  (DE 151:61).

After Mr. Curtis left for Florida, LS continued to work as a prostitute.  (DE 151:62).  She stated she could not find a regular job.  (DE 151:62).  She used Mr. Curtis' credit card number to pay for the ads she posted.  (DE 151:63).  She identified one ad in she posted on April 5, 2011, in which she called herself "Sweet Barbie." (DE 151:90).  LS testified that she was speaking with Mr. Curtis' mother after he was arrested.  (DE 151:63).  She stated that she asked Williams if she could ask Mr. Curtis if LS should post.  (DE 151:63).

One day several months after Mr. Curtis left North Carolina, LS was in a hotel room when agents from the Federal Bureau of Investigation ("FBI") arrived.  (DE 151:64).  She did not tell them she worked as a prostitute for the past year and half with Mr. Curtis.  (DE 151:64).  She testified that her cousin checked into the hotel using her own identification and that she was not working as a prostitute, but only there to have fun.  (DE 151:65).  LS testified that she lied to the FBI when they first questioned her.  (DE 151:66, 121).  She admitted she lied to the FBI and told them that she did not tell Mr. Curtis how old she was when she and Mr. Curtis first met.  (DE 151:66).  LS told the FBI Mr. Curtis thought she was 18.  (DE 151:67).  LS testified that she lied because she did not want to get Mr. Curtis in trouble.  (DE 151:66).

24

LS testified that she lied to the FBI the second time she met with them at her mother's house. (DE 151:68).

On cross examination, LS admitted that she was not always an honest person. (DE 151:72-73). She also admitted that she met twice with the government to prepare for her testimony. (DE 151:75). LS admitted that she used false names in the past. (DE 151:76).

LS testified that she was pregnant at the time of trial, but that Mr. Curtis was not the father. (DE 151:79). She stated she was not charged in relation to any of her activities with Mr. Curtis. (DE 151:80).

### B.    BSO Detective Bruce Link

Broward County Sheriff's Office Detective Bruce Link testified that he was called in to investigate the possible abduction of a juvenile female, LS. (DE 151:206). He interviewed Mr. Curtis at the Hollywood Police Department and later at the sheriff's office. (DE 151:208,213 ). Mr. Curtis agreed to talk to Detective Link and signed a waiver of rights form which was admitted into evidence. (DE 151:209). Mr. Curtis denied having a cell phone at first and then stated that he had a cell phone, but that it was not activated. (DE 151:215). He asked Mr. Curtis if he knew LS and he admitted to knowing her and to seeing her the previous night. (DE 151:222). He testified that Mr. Curtis told him LS called him at his mother's home and said she was

25

at the El Palacio hotel and asked to be picked up.  (DE 152:5).  He stated Mr. Curtis told him he picked up LS and eventually went to a local casino with LS and one of her friends, but law enforcement was never able to confirm that information.  (DE 152:6,8).  While Mr. Curtis was being interviewed by Detective Link, KP was also at the sheriff's office in another room giving a statement.  (DE 151:220).  Mr. Curtis allowed Detective Link to search his truck and then the truck was released to Mr. Curtis.  (DE 151:223).  Law enforcement found four cell phones, but Mr. Curtis denied knowing who the phones belonged to and specifically whether one belonged to LS.  (DE 152:14).  Law enforcement also found a Kodak camera that belonged to LS.  (DE 152:15).

Detective Link testified that Mr. Curtis denied knowing how to get in touch with LS, but that he would ask her to call the detective if he was in contact with her. (DE 152:17).  A day or two later, Mr. Curtis called Detective Link and told him he had been in contact with LS and he told her to call the detective.  (DE 152:18). Several days later, LS left a message on Detective Link's office phone in which she stated she was okay and in Miami.  (DE 152:19).  He testified that she said she was leaving town and he could not reach her.  (DE 152:19).  Although the phone call was recorded, the recording was erased and the jury was not able to hear LS's exact words.  (DE 151:19).

On cross examination, Detective Link admitted that Mr. Curtis approached law enforcement officers and cooperated from the beginning of the investigation. (DE 152:22-23). Even though Mr. Curtis was cooperating, he was handcuffed when he was transferred from the Hollywood Police Department to the Broward Sheriff's Office and he was shackled to the floor when he was placed in an interview room. (DE 152:27). Detective Link testified that it was "standard procedure." (DE 152:27). Sometimes he was loud and aggressive with Mr. Curtis. (DE 152:30). In the end, the report of an abduction was determined to be unfounded. (DE 152:31).

### C.    Social Networking Sites

Representatives from backpage and craigslist testified about how the web sites worked. (DE 151:144-205).

### D.    BSO Detective Arnaldo Barrionuevo

BSO Detective Arnaldo Barrionuevo testified that he was a member of the South Florida Internet Crimes Against Children ("ICAC") task force. (DE 152:57). He examined several cell phones involved in this case and generated a report detailing phone numbers called and texts exchanged. (DE 152:61-76).

### E.    Michael Chizmar

Michael Chizmar testified that he was the general manager at the La Quinta Inn in Fort Lauderdale, Florida. (DE 152:86). Chizmar stated that guests can book rooms

27

online or just walk into the hotel and book a room. (DE 152:87). Guests pay for rooms either by credit card or with cash. (DE 152:88). He identified a guest report which contained the name "Leighton Curtis." (DE 152:91). Mr. Curtis is a "special stay member" and was assigned a specific club number. (DE 152:92). The report showed that a person with Mr. Curtis' name checked into the hotel on January 11, 2011 and checked out on January 17, 2011 and apparently paid cash. (DE 152:92-94). The report stated that Mr. Curtis rented a second room on January 12, 2011 and checked out on January 18, 2011. (DE 152:97-98). Chizmar identified a security tape which showed a guest on January 12, 2011 paying for a room. (DE 152:108).

### F.    FBI Special Agent Regino Chavez

FBI Special Agent Regino Chavez testified that he was a member of the Crimes Against Children Unit. (DE 152:109). He testified that he was called in to investigate a case involving possible prostitution. (DE 152:110). As part of the investigation, he subpoenaed documents from backpage, craigslist, Verizon, Sprint and various hotels. (DE 152:110). He also subpoenaed documents from Yahoo for the email address leebus18@yahoo.com. (DE 152:112).

Special Agent Chavez stated that he met with Mr. Curtis at his mother's home on March 18, 2011 and that Mr. Curtis was arrested on that date. (DE 152:119). Officers obtained a note pad from Mr. Curtis which contained the email address

28

letmebemyself08@gmail.com which appeared on some backpage ads. (DE 152:123). Special Agent Chavez stated that he eventually interviewed LS several different times. (DE 152:124).

Special Agent Chavez testified that he made a copy of the video recorded by LS at the Sea Club hotel. (DE 152:127). He stated that the video is a little "jerky" in the beginning and at other times because the computer was being moved and the mouse pad was being clicked by LS. (DE 152:127).

On cross examination, Special Agent Chavez admitted that the phone number, believed to belong to Mr. Curtis, actually was registered to a woman named Sandra Gunn, but law enforcement was never able to determine who she was. (DE 152:135). The email address leebus18@yahoo.com was created by a person located in Resende, California, and that the address had no login activity from December, 2010, to January 26, 2011. (DE 152:137). The email address letmebemyself08@gmail.com was associated with a person named Marissa Marshall, also located in California. (DE 152:138). Another email address listed on backpage, deliciousdiamond69 @playful.com was associated with KP and had several addresses including Oakland, California and Seattle, Washington. (DE 152:138-39). The email was registered to a person named William Weeks. (DE 152:139). The email address sharpstepper @aol.com was registered to a person named Sharda Mohammed in New York. (DE

29

152:142).

Special Agent Chavez testified that he spoke and met with LS about ten times prior to trial. (DE 152:145). He admitted that she lied to law enforcement. (DE 152:146). In an interview conducted on May 12, 2011, Special Agent Chavez informed LS that agents knew she lied to them. (DE 152:150). LS told him she came to Florida with Mr. Curtis to "go to the beach." (DE 152:155).

LS told Special Agent Chavez that after she left King, she stayed with a rapper whose name she could not remember. (DE 152:154). She claimed that although she had sex with him and he gave her money, she did not have "sex for money." (DE 152:154). He was never able to locate the boyfriend and could not confirm her story. (DE 152:154).

### G.    Teria Brown

Teria Brown testified that she worked for the FBI as an investigative analyst. (DE 152:159). She stated she created reports for this case analyzing various hotel records and bank records. (DE 152:162). She also created a report analyzing phone and text messages. (DE 152:163). She determined that from September, 2010, to January, 2011 LS and Mr. Curtis exchanged 795 calls. (DE 152:166).

The government rested after Brown's testimony. Mr. Curtis moved for a judgment of acquittal pursuant to Fed.R.Crim.Proc. 29. (DE 152:174-78). The

district court denied the motion.  (DE 152:179).

Mr. Curtis introduced Seminole Hard Rock Indian Tribe casino records.  (DE 152:190).  The records showed Mr. Curtis' gambling activities.  (DE 152:182).  Mr. Curtis did not testify.  (DE 152:187).   Mr. Curtis renewed his Rule 29 motion which was denied.  (DE 152:200).

After closing arguments, the district court instructed the jury and it began deliberations.  (DE 153:4-45).

On November 18, 2011, the jury found Mr. Curtis guilty of both Counts.  (DE 153:65).

### 4.    Sentencing

A Presentence Investigation Report ("PSR") was prepared.  Mr. Curtis' base offense level was set at 32, pursuant to U.S.S.G. § 2G2.1.  (PSR ¶ 27).  Two levels were added because the child pornography contained pictures of a minor who had attained the age of 12 years, but not attained the age of 16.   U.S.S.G. § 2G2.1(b)(1)(B); (PSR ¶ 28).  Two levels were added because the offense involved the commission of a sexual act or sexual contact.  U.S.S.G. § 2G2.1(b)(2)(A); (PSR ¶ 29).   The probation officer added two levels because the offense "involved the use of a computer or an interactive computer service to solicit participation by a minor in sexually explicit conduct.  U.S.S.G. § 2G2.1(b)(6)(B)(ii); (PSR ¶ 30).  Two levels

31

were added because the probation officer believed that Mr. Curtis obstructed justice. U.S.S.G. § 3C.1; (PSR ¶ 32). The total adjusted offense level was 40. (PSR ¶ 34). Ultimately it was determined that Mr. Curtis' criminal history category was I. (DE 154:42).

Based on a total offense level of 40 and a criminal history category of I, the advisory guideline imprisonment range was 292-365 months. (DE 154:42).

Mr. Curtis filed written objections to the PSR. (DE 118). He again asserted his innocence and so objected to the offense conduct portion of the PSR. (DE 118:1). He argued that he should not have to pay restitution. (DE 118:1). He further objected to enhancements for obstruction of justice, for the fact the victim was a minor, use of a computer and for the fact that the offense conduct involved sexually explicit conduct. (DE 118:1). He further objected to the imposition of criminal history points for a prior New York conviction. (DE 118:1). He requested that he be placed in a 500 hour drug treatment program and that he be designated close to South Florida. (DE 118:1-2). The government filed a written response arguing that the jury found the defendant guilty and relied upon the trial testimony. (DE 120;1). The government further argued that it would seek to prove a restitution amount and that the other sentencing enhancements were properly assessed. (DE 120:1-5). The government also filed a motion for an order of restitution. (DE 119).

32

A sentencing hearing was held on February 9, 2012. (DE 154). The district court first addressed Mr. Curtis' objection to the two-level enhancement for obstruction of justice. (DE 154:5). The government argued that the enhancement was appropriate because the magistrate judge found that Mr. Curtis lied when he testified at the motion to suppress hearing. (DE 154:6). The district court denied the objection and found that Mr. Curtis willfully obstructed the administration of justice. (DE 154:7).

Mr. Curtis next argued that he should not receive a two-level enhancement for the use of a computer because this was not the kind of case in which such an enhancement should apply. (DE 154:17-18). He argued that a computer was not used to "persuade, induce, entice or facilitate" the travel of a minor to engage in sexually explicit conduct because LS was the person who first used the computer to solicit clients which is how Mr. Curtis met her. (DE 154:19-20). The district court denied the objection. (DE 154:22).

The district denied Mr. Curtis' other objections to the enhancements imposed by the probation officer in the PSR. (DE 154:15,17).

The district court sustained Mr. Curtis' objection to the imposition of three criminal history points based on a previous New York conviction. (DE 154:40).

33

The district court granted the government's request for the imposition of an order of restitution.  (DE 154:33).

Based on the district court's rulings, Mr. Curtis' adjusted base offense level was set at 40 and his criminal history category was I resulting in an advisory guideline range of 292 to 360 months imprisonment.  (DE 154:42).

Mr. Curtis addressed the district court.  (DE 154:44).  He told the district court he was innocent and did not know that LS was a minor.  He stated he never took money from LS and that she manipulated him.  (DE 154:44-45).  LS and her mother also addressed the district court.  (DE 154:47).  LS stated that she was used by Mr. Curtis because he took the money she earned and gambled and used it for himself. She felt betrayed because he brought other girls into the "family."  She stated that she loved him, but he hurt her verbally, mentally and physically.  (DE 154:47-48).  LS's mother stated that Mr. Curtis should have brought her daughter home as soon as he met her and that she was devastated that her daughter had been used for prostitution. She asked the district court to give him the maximum possible sentence.  (DE 154:48-49). The government also argued that Mr. Curtis should receive the maximum possible sentence because of his actions and because he continued to deny his guilt. (DE 154:49-54).

The district court imposed a sentence of 360 months imprisonment to be followed by lifetime supervised release.  (DE 154:60-61).   This timely appeal followed.  (DE 127).

**Standards of Review**

In an appeal concerning a motion to suppress, findings of fact are reviewed for clear error, while the application of the law to those facts is subject to *de novo* review. *United States v. Tokars*, 95 F.3d 1520 (11th Cir. 1996).

The Court of Appeals reviews a lower court's decision to admit evidence only for an abuse of discretion. *United States v. Hill*, 643 F.3d 807, 840 (11th Cir. 2011).

On a challenge to sufficiency of the evidence to sustain a conviction, this Court reviews the evidence *de novo* to determine whether a reasonable jury, from the evidence presented, could have concluded beyond a reasonable doubt that the defendant was guilty of the crimes charged. *United States v. Lopez-Ramirez*, 68 F.3d 438, 440 (11th Cir. 1995). The Court resolves all reasonable inferences and credibility evaluations in favor of the jury's verdict. *United States v. McCarrick*, 294 F.3d 1286, 1289 (11th Cir. 2002).

The Court reviews the district court's factual findings for clear error, and application of the sentencing guidelines *de novo*. *United States v. Garrett*, 190 F.3d 1220, 1222 (11th Cir. 1999).

The district court's sentence should be reviewed for reasonableness. *United States v. Talley*, 431 F.3d 784 (11th Cir. 2005).

## SUMMARY OF THE ARGUMENT

Mr. Curtis believed that his conversation with the unidentified female was private and he did not know that it would be recorded by LS. Although he spoke to the unidentified female on his cell phone with the speaker phone function activated, he testified that he did not believe LS was paying attention to his conversation. His expectation of privacy in conversations held within the privacy of his hotel room on his own cell phone is a subjective expectation of privacy that society would recognize as reasonable. The video should have been suppressed.

The evidence was insufficient to convict Mr. Curtis of Counts 2 and 3 of the indictment. The jury unreasonably relied upon LS's incredible testimony. If there is a lack of substantial evidence, viewed in the government's favor, from which a reasonable fact finder could find guilt beyond a reasonable doubt, Mr. Curtis' convictions must be reversed.

The district court denied Mr. Curtis a fair trial when it ruled that he could not admit evidence under Fed.R.Evid. 412–still photographs and video recordings of LS having sex with other men after Mr. Curtis was arrested. The photos and videos were relevant and should have been admitted under an exception to Rule 412. The district court's ruling prevented Mr. Curtis from defending himself against the elements of the crimes charged and from attacking LS's credibility thus violating his

37

constitutional rights and denying him a fair trial.

Mr. Curtis' sentence was both procedurally and substantively unreasonable. The district court improperly assessed a two level enhancement based on use of a computer.  The district court also imposed a sentence which was greater than necessary to comply with the purposes of sentencing.  A sentence at the low end of the guidelines would have been sufficient punishment.  Mr. Curtis' sentence should be vacated and this case remanded.

## ARGUMENT AND CITATIONS OF AUTHORITY

<u>Issue I</u>

**THE DISTRICT COURT SHOULD HAVE SUPPRESSED THE VIDEO RECORDING WHICH WAS RECORDED IN VIOLATION OF MR. CURTIS' EXPECTATION OF PRIVACY.**

Mr. Curtis moved to suppress a one and a half hour video recorded by LS on her computer's web camera when Mr. Curtis and LS were staying at the Sea Club Hotel in July, 2010. Mr. Curtis was unaware that LS was recording his telephone conversation with an unidentified female and his other actions during the one and a half hours.

Title III of the Omnibus Crime and Control and Safe Street Act of 1968 prohibits the intentional interception and disclosure of any wire, oral, or electronic communications. 18 U.S.C. § 2511. No part of a wire or oral communication and no evidence derived from the communication may be received in evidence at any trial if use of the evidence violates the wire tap chapter. 18 U.S.C. § 2515. Any aggrieved person in any trial or other similar proceeding may move to suppress the contents of the wire or oral communication or evidence derived therefrom. 18 U.S.C. § 2518(10)(a). The United States Supreme Court has held that suppression is necessary and proper to protect privacy. *United States v. Giordano*, 416 U.S. 505,

39

529, 94 S. Ct. 1820, 1833 n.17 (1974).

Mr. Curtis is an "aggrieved person" as that term is defined under 18 U.S.C. § 2518(10)(a). Such a person is defined as a "person who was a party to an intercepted . . . communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). It is undisputed that Mr. Curtis was a party to the intercepted phone conversation and to the conversations between himself and LS. The government conceded at the motion to suppress that the communication was an "oral communication."

In deciding whether an interception of an oral communication violates either the Constitution or the federal wiretap statute, the test of whether a person has a reasonable expectation of privacy has two prongs. The first prong is whether that person exhibits a subjective expectation of privacy. The second is whether that subjective expectation of privacy is one that society is willing to recognize as reasonable. *United States v. McKinnon*, 985 F.2d 525, 527 (11th Cir. 1993).

It is undisputed that Mr. Curtis was in a space that he considered private–a hotel room for which he had paid. At the suppression hearing, Mr. Curtis testified that he did not give LS permission to record him in the hotel room and specifically his conversation with the unidentified female. Clearly, if Mr. Curtis knew he was being videotaped he would have put on more clothing. LS admitted at the

40

suppression hearing that she intentionally turned on the computer, but then stated that she forgot the computer was recording.

The magistrate judge's ruling and the district court's subsequent adoption of that ruling were erroneous. The magistrate judge's R&R contained numerous facts which were irrelevant to the finding of whether LS improperly recorded Mr. Curtis' conversation. And, although the judge found that Mr. Curtis' testimony was not credible, such a finding is not critical to the legal conclusion regarding whether the recording should have been suppressed.

Mr. Curtis believed that his conversation with the unidentified female was private and he had no reason to believe that it would be recorded by LS. Although he spoke to the unidentified female on his cell phone with the speaker phone function activated, he testified that he did not believe LS was paying attention to his conversation. His expectation of privacy in conversations held within the privacy of his hotel room on his own cell phone is a subjective expectation of privacy that society would recognize as reasonable. The video should have been suppressed.[2]

---

[2] Mr. Curtis acknowledged at the motion to suppress hearing that his argument was "very weak" regarding the portion of the video regarding his conversation directly with LS and LS's conversations with unidentified males.

41

Issue II

**THE EVIDENCE WAS INSUFFICIENT TO SUPPORT MR. CURTIS' CONVICTIONS.**

Mr. Curtis was charged with sex trafficking in Count 2 of the indictment and with sexual exploitation of a minor in Count 3. He maintains his innocence of both charges. In order to prove Mr. Curtis engaged in sex trafficking, the government was required to present sufficient evidence that Mr. Curtis knew LS was under 18 years old or that he used force, threats of force, fraud or coercion. 18 U.S.C. § 1591(a). In order to prove Mr. Curtis sexually exploited a minor, the government had to present sufficient evidence that Mr. Curtis persuaded, induced, enticed or coerced LS to engage in sexually explicit conduct and that he knew she was a minor. 18 U.S.C. § 2251(a). Mr. Curtis asserts that the evidence was insufficient to support the jury's verdict on Counts 2 and 3.

On a challenge to sufficiency of the evidence to sustain a conviction, this Court reviews the evidence *de novo* to determine whether a reasonable jury, from the evidence presented, could have concluded beyond a reasonable doubt that the defendant was guilty of the crimes charged. *United States v. Lopez-Ramirez*, 68 F.3d 438, 440 (11th Cir. 1995). The Court resolves all reasonable inferences and credibility evaluations in favor of the jury's verdict. *United States v. McCarrick*, 294 F.3d 1286,

42

1289 (11th Cir. 2002). "If there is a lack of substantial evidence, viewed in the government's favor, from which a reasonable fact finder could find guilt beyond a reasonable doubt, the conviction must be reversed." *Mieres-Borges*, 919 F.2d 652, 656 (11th Cir. 1990).

There was no evidence presented at trial that Mr. Curtis forced, induced, enticed or coerced LS into engaging in prostitution. The evidence was undisputed that LS engaged in prostitution prior to meeting Mr. Curtis and continued to so afterward. She testified that she posted ads on social networking sites prior to meeting Mr. Curtis and continued to do so after he was arrested. She further testified that she liked making money committing prostitution and that she liked videotaping and taking pictures of herself and that she did it with and without Mr. Curtis' knowledge, but that she did not seek his permission.

LS's testimony at trial was not credible regarding whether she told Mr. Curtis that she was under 18 years old. Although LS testified that she told Mr. Curtis very early in their relationship that she was under 18, she also admitted to lying to numerous other people about her age, including law enforcement, friends and Mr. Curtis' family. LS also lied to family and friends about where she was, about her relationship with Mr. Curtis and about what she was doing in general. Although LS testified that certain phone numbers and email addresses were associated with Mr.

43

Curtis, Special Agent Chavez testified that, in fact, the email addresses and phone number were registered to men and woman who lived all over the United States, none in Florida.  The evidence was also clear that LS was a sophisticated prostitute before she met Mr. Curtis and had been misrepresenting her age to many people prior to meeting Mr. Curtis.  It was not reasonable for the jury to rely upon her incredible testimony and Mr. Curtis' convictions should be vacated.

<u>Issue III</u>

## THE DISTRICT COURT ERRED WHEN IT RULED MR. CURTIS COULD NOT INTRODUCE EVIDENCE UNDER FED.R.EVID. 412 DENYING MR. CURTIS A FAIR TRIAL.

The district court denied Mr. Curtis a fair trial when it ruled that he could not admit evidence under Fed.R.Evid. 412.

Mr. Curtis sought to introduce evidence of LS's sexual activity unrelated to her relationship with Mr. Curtis. He sought to introduce still photos and videos taken by LS with men after Mr. Curtis was arrested. The government argued that the evidence was irrelevant and that it did not fall under an exception to Fed.R.Evid. 412 which bars the admission of evidence concerning a victim's sexual behavior or past behavior.

The rule states in part:

(a)  Prohibited Uses. The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct:

(1) evidence offered to prove that a victim engaged in other sexual behavior; or

(2) evidence offered to prove a victim's sexual predisposition.

**(b)  Exceptions**.

45

**(1) Criminal Cases**.  The court may admit the following evidence in a criminal case:

> **(A)** evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence.

> **(B)** evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and

> **(C)** evidence whose exclusion would violate the defendant's constitutional rights.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.

The government argued that LS would testify that she engaged in prostitution before she met Mr. Curtis and afterward and, therefore, the defense did not have to enter into evidence the photos or videos of LS engaging in sex with various men.  The district court ruled that it would reserve ruling until after LS's testimony.  After LS testified, the district court ruled that Mr. Curtis was prohibited from not only admitting, but even mentioning, the videos made by LS of her having sex with various men.  The videos were found on the same computer that LS used to make the

46

recording of she and Mr. Curtis at the Sea Club which was the subject of the motion to dismiss. The videos were made after Mr. Curtis was arrested.

Mr. Curtis raised the issue at all points during the trial. He argued that he should be permitted to introduce the photos and videos under exception (C) to Rule 412, because Mr. Curtis' right to confront his accuser was being violated. The district court denied his request to introduce the evidence.

Mr. Curtis should have been able to introduce the proffered evidence to show that LS was not under his control and that he did not entice, force or coerce her into engaging in prostitution which were elements of both charges. He should have been able to present the evidence to defend against those elements. Mr. Curtis also should have been able to present the evidence to attack LS's credibility where there was evidence that she lied about numerous topics including how Mr. Curtis controlled her. The district court's ruling violated Mr. Curtis' constitutional rights and denied him a fair trial.

<u>Issue IV</u>

## MR. CURTIS' 360-MONTH SENTENCE WAS BOTH PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE.

Mr. Curtis' sentence must be reviewed for reasonableness. *United States v. Talley*, 431 F.3d 784, 785 (11th Cir. 2005). After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), a sentence may be reviewed for procedural and substantive reasonableness. *United States v. Campbell*, 491 F.3d 1306, 1314 (11th Cir. 2007). First, the district court must consult the Guidelines and correctly calculate the range provided by the Guidelines." *Tally*, 431 F.3d at 786. Second the district court must consider the statutory sentencing factors to determine a reasonable sentence. 18 U.S.C. § 3553(a). On appeal, a defendant's sentence may be reviewed for "procedural" or "substantive" unreasonableness. *United States v. Hunt*, 459 F.3d 1180 (11th Cir. 2006). A sentence may be unreasonable if it is the product of a procedure that does not follow the requirements set forth in *Booker*, regardless of the actual sentence; or a sentence may be substantively unreasonable, regardless of the procedure used. *Id.* Mr. Curtis challenges both the procedural and the substantive reasonableness of his sentence.

1.    <u>Mr. Curtis' Sentence is Procedurally Unreasonable</u>.

Mr. Curtis should not have received a two level enhancement pursuant to

48

U.S.S.G. § 2G2.1(b)(6)(B)(ii) for use of a computer to solicit participation by a minor in sexually explicit conduct. Application note 4(B) states that the enhancement should be applied when a computer is used to induce, entice, coerce, or facilitate the travel, of a minor to engage is sexually explicit conduct for the purpose of producing sexually explicit material. "Subsection (b)(6)(B) is intended to apply only to the use of a computer . . . to communicate directly with a minor . . .. Accordingly, the enhancement would not apply to the use of a computer . . . to obtain airline tickets for the minor from an airline's Internet site." U.S.S.G. § 2G2.1(b)(6)(B), commt. n.4(B)(2011).

In this case, Mr. Curtis did not use a computer to induce, entice, coerce, or facilitate the travel, of LS to engage in sexually explicit conduct for the purpose of producing sexually explicit material. LS first posted an ad about herself on the computer on a social networking site and Mr. Curtis called her. He merely obtained her phone number from the ad. Additionally, any photographs taken by Mr. Curtis were never posted on the computer because they were rejected, according to LS's trial testimony, by the social networking sites. Any sexually explicit photos or videos of LS, while she was with Mr. Curtis, were found on her Kodak camera–not on her computer. The sexually explicit photos and videos of LS found on her computer were produced by her after Mr. Curtis' arrest.

49

The enhancement was meant to apply to situations where a defendant communicated with a minor, via the computer, to entice the minor to meet the defendant or situations where the sexually explicit conduct was uploaded onto the computer by the defendant.

The facts of this case are closer to the facts identified in the commentary which would not warrant an enhancement–purchasing of tickets on the computer. The evidence showed Mr. Curtis purchased hotel rooms using the computer and that he and LS posted ads on the computer–none of which would qualify as "sexually explicit" for purposes of the enhancement. The district court erred in enhancing Mr. Curtis' advisory guidelines two levels.

## 2.    Mr. Curtis' Sentence is Substantively Unreasonable.

Mr. Curtis' 360 month sentence is unreasonable. The district court was required to impose a sentence which is "sufficient, but not greater than necessary, to comply with the purposes" listed in § 3553(a). They are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the

Sentencing Guidelines' range; (8) the pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims. *Id.*

This Court has held that the district court need not explicitly discuss each of the § 3553(a) factors in imposing sentence so long as the record reflects that the district court "adequately and properly considered" the factors, *United States v. Scott*, 441 F.3d 1322, 1329-30 (11th Cir. 2006). In evaluating whether a given sentence is "unreasonable," this Court must consider both the § 3553(a) factors, and the reasons given by the district court. *United States v. Williams*, 435 F.3d 1350, 1354-55 (11th Cir. 2006).

Although the charged crimes in this case are certainly serious, the district court failed to consider factors which would have justified a lesser sentence. Mr. Curtis was not a violent offender. He had very little criminal history. LS was a girl who had been running away from home several years before Mr. Curtis met her and she was engaging in prostitution before he met her. It is clear from the evidence that LS would have engaged in prostitution even if she had not met Mr. Curtis based on the fact that she worked for "King" prior to meeting Mr. Curtis and continued to work as a prostitute after Mr. Curtis was incarcerated.

A sentence at the low end of the guidelines would have been sufficient punishment.  Mr. Curtis' sentence should be vacated and this case remanded.

**CONCLUSION**

Based upon the foregoing argument and citations of authority, the Court should vacate Mr. Curtis' conviction and remand this case.

Respectfully submitted,

MICHAEL CARUSO
INTERIM FEDERAL PUBLIC DEFENDER

_____
Gail M. Stage
Florida Bar No. 867179
Assistant Federal Public Defender
1 E. Broward Blvd., Suite 1100
Fort Lauderdale, Florida 33301
Telephone No. (954) 356-7436
Gail_Stage@fd.org

**CERTIFICATE OF COMPLIANCE**

I CERTIFY that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7). According to the WordPerfect program on which it is written, the numbered pages of this brief contain 11,257 words.

_____
Gail M. Stage

53

## CERTIFICATE OF SERVICE

I HEREBY certify that on the 10th day of August, 2012, I electronically filed the foregoing brief with the Clerk of the Court using CM/ECF and sent an original and six copies to the Clerk of the Court via FedEx.  I hereby further certify that the foregoing document is being served this day via CM/ECF and FedEx on Anne Schultz, Assistant United States Attorney, 99 N.E. 4th Street, Miami, Florida 33132 and is being sent via U.S. Mail to Mr. Leighton Martin Curtis, Reg no. 96507-004,

_____

Gail M. Stage

P:\Curtis, Leighton M.  Reg 96507-004\Briefs\CurtisBrief2.wpd

54